## WHITE, receiver, v. DAVIS, receiver.

1. In the absence of constitutional provision or legislative enactment for that purpose, the superior court, exercising equitable jurisdiction, is not authorized to accept a voluntary surrender of the charter of a private corporation, and as an incident thereto, on ex parte petition in the name of the corporation, to appoint a receiver for the assets of the company, with power to continue its business with a view to ultimately disposing of its assets, paying its debts, and distributing the remainder of the proceeds among its stockholders.

2. The Civil Code of 1895, § 1886, does not provide for a dissolution of a corporation by the superior court, by means of a voluntary surrender of its franchises to the court and the appointment of a receiver, on its own petition ex parte. It provides that, "upon the dissolution of a corporation, for any cause," the property and assets shall constitute a trust fund, first for the payment of its debts, and then for equal

distribution among its members, and that to this end the superior court may appoint a receiver.

3. By the third subdivision of the second section of the bankruptcy act of 1898 it is declared that the district courts of the United States, as courts of bankruptcy, have jurisdiction to "appoint receivers or the marshals, upon application of parties in interest, in case the courts shall find it absolutely necessary, for the preservation of estates, to take charge of the property of bankrupts after the filing of the petition and until it is dismissed or the trustee is qualified."

4. If, acting within the jurisdiction conferred by the bankruptcy act, the court of bankruptcy appoints a receiver, this court has no jurisdiction to review such appointment and pass upon the wisdom, expediency, or propriety thereof. If parties in interest are of the opinion that the appointment was improvidently made, the remedy is by motion to vacate or other appropriate proceeding in the Federal courts.

5. Where, upon an ex parte petition filed by a private corporation in the superior court, it was sought to surrender its franchises and to invoke the aid of that court as one exercising equitable jurisdiction in winding up its affairs, though alleging solvency; and where a receiver was accordingly appointed, and within four months thereafter a petition was filed by certain creditors of the corporation to have it adjudged an involuntary bankrupt, and on application a receiver was appointed by the court of bankruptcy, with direction to apply to the State court for a delivery to him of the assets of the company, it was error on the part of the judge of the State court to deny such application.

6. If there was any irregularity in regard to the bond required to be given in the court of bankruptcy, which was approved by the presiding judge, it was not such as to render the proceedings void or to authorize a denial by the superior court of the petition of the receiver appointed by the court of bankruptcy, under order of that court, to have delivered to him the assets in the hands of the receiver appointed by the State court.

MARCH 19, 1910.

Application of receiver in bankruptcy.    Before Judge Charlton. Chatham superior court.    July 2, 1909.

The directors of the Electric Supply Company passed the following resolution: "Resolved, that the present financial condition of this company is found to be such as that, although solvent, it is impossible to successfully continue its business; further, that it is deemed essential to the preservation of the assets of the company and to the safety and security of its creditors and stockholders that the company surrender its franchises, dissolve its corporation, and have its assets administered by the court, through its receiver, for the purpose of paying the debts and distributing the balance among the stockholders; further, that counsel for this company be and he is hereby authorized and directed to institute the proceed-

ings necessary to accomplish this result." · It was alleged that this action was ratified by the stockholders. An ex parte petition in · the name of the company was presented to the superior court of Chatham county. It set out the resolution, and alleged that the company, was solvent, but that, owing to gross mismanagement, its financial affairs were such that it could not hope to continue business; that its credit was impaired, if not destroyed, and it was impossible to raise funds to meet its matured and maturing demands against it; that some of its notes were past due, and it was threatened with suits, which would result in levies and depletion of its assets. The prayers were, for the appointment of a receiver; that he be authorized to continue the business of the company, with power to buy and sell materials, make contracts, collect indebtedness, etc.; that he convert the assets into money as soon as practicable, and, after paying the expenses of administration, that such fund be applied first to the payment of debts, and then for distribution among stockholders; that persons having claims against it be required to set them up by intervention in this proceeding, and that petitioner have leave to apply for a restraining order against any independent action by creditors; and for general relief. Three banks which were large creditors expressed in writing their approval of the proceeding, but did not become parties. The judge of the superior court appointed a receiver as prayed. Within four months thereafter certain creditors filed a petition to have the company adjudged an involuntary bankrupt. A petition was also presented to the court of bankruptcy, alleging as an act of bankruptcy the application of the company to the superior court, and the appointment by that court of the receiver, when the company was insolvent. The alleged bankrupt answered, denying insolvency, or the commission of any act of bankruptcy, and demanding a jury trial. A petition for a receiver was also presented to the court of bankruptcy. An order nisi issued. On the hearing a receiver was appointed, with direction to apply to the judge of the superior court for an order to have the receiver appointed by that court to deliver the assets to the receiver in bankruptcy. The application was made, and to its denial the applicant excepted.

*Akerman & Akerman, Talley & Heyward,* and *O'Byrne, Hartridge & Wright,* for plaintiff. *W. B. Stephens, Adams & Adams, Garrard & Meldrim,* and *G. W. Owens,* for defendant.

LUMPKIN, J.    (After stating the foregoing facts.)

The judge of the superior court denied the petition of the receiver appointed by the court of bankruptcy that the receiver appointed by the State court be directed to deliver the assets in his hands to the petitioner.    Was this error?    This was not an equitable proceeding, with parties plaintiff and defendant, and with a prayer for the appointment of a receiver.    It did not rest on the general powers of a court of equity as such, or of a court having equitable jurisdiction.    The presiding judge based his action on the theory · that the company could surrender its charter to the superior court, and that the court could accept such surrender, and as an incident thereto, or a result thereof,  could appoint ·a receiver on its ex parte petition.    In an opinion filed by him in deciding the question now before us for review, he said, among other things: "Whether the conclusion was judicially right or wrong, or however it may weaken or strengthen the jurisdiction of this court, the fact remains that the controlling idea with which the court assumed jurisdiction was based upon the resolution looking to a surrender of the charter.    If a charter may not be surrendered to this court, then I have no hesitation in saying that in my judgment my juris-diction is not as assured as I considered it when this court took charge of the estate. ˙ .    .    But the jurisdiction at last seems to rest upon the act of surrender."

In England corporations were created either by virtue of the royal prerogatives or by act of parliament.    If they were created by the crown, it was done by letters patent under its seal and duly enrolled.    If by parliament, it was accomplished by an act enrolled and with the great seal attached.    When grants by the crown were dissolved upon surrender by the grantees, the acceptance of the king of such surrender was required to be enrolled.    Butler v. Palmer, 1 Salk.    *191.    A parliamentary grant could only be dissolved by act of parliament.    In America there has been some diversity of views as to the necessity for an acceptance of a surrender of franchises, especially by a strictly private corporation.    On the general subject see 2 Kent's Com. 209; Boston Glass Mfg. Co. v. Langdon, 24 Pick. (Mass.) 49 (35 Am. D. 292) ; Revere v. Boston Copper Co., 15 Pick. (Mass.) 351; Portland Dry Dock & Insurance Co. v. Trustees of Portland, 51 Ky. (12 B. Monroe) 77; Curien v. Santini, 16 La. Ann. 27; Polar Star Lodge No. 1. v. Polar Star

Lodge No. 1, Id. 53; Harris *v.* Muskingum Mfg. Co., 4 Blackf. (Ind.) 267 (29 Am. D. 372); Merchants & Planters Line *v.* Waganer, 71 Ala. 581, 587; 10 Cyc. 1299(E), 1300 (B). In *Mechanics' Bank* v. *Heard, 37 Ga.* 401, a bank which had been incorporated by the legislature sought to surrender its charter to the State by resolution of its directors, and forwarding notice of the surrender to the Governor, which was received by him. It was held that "A corporation made by the General Assembly of this State can not terminate its existence by a voluntary surrender of its charter; the surrender must be accepted by the General Assembly." Walker, J. dissented. In the opinion Harris, J., entered into a full discussion of the subject. In *Young* v. *Moses, 53 Ga.* 628, 629, the decision in the *Mechanics' Bank* case was cited, and it was said by Trippe, J., that "a corporation does not cease to exist by the adoption of resolutions by the stockholders that it will do no more business. A dissolution requires more than a mere declaration." The *Mechanics' Bank* case was again cited approvingly in *Milliken* v. *Steiner, 56 Ga.* 251, 257. In *Central Railroad & Banking Co.* v. *State, 54 Ga.* 401, in the course of the discussion, Warner, C. J., referred to the case already mentioned, and said that this court had never decided that when the State withdraws any of the franchises granted to a corporation, since the adoption of the code, such corporation could not voluntarily surrender its franchises to the State. In the concurring opinion McCay, J., said: "This court has not held that a corporation created since the code may not surrender its franchises without the consent of the State. Indeed, such a right would seem to follow from the reservation of the right to repeal." The State was seeking to impose taxes upon a consolidated corporation, and the real question was as to whether it could do so, or whether certain provisions of the original charters prevented it. So that this was not a ruling that a railroad company could simply surrender its charter and terminate its existence at will. If a charter is in the nature of a contract between the State and the corporation, as held in the Dartmouth College case, 4 Wheat. 517 (4 L. ed. 629), a reservation by the State in the charter itself, or in a pre-existing general law, of the right to modify or repeal the franchise, does not seem necessarily to imply that the other party has the same right, or a corresponding right of surrender and destruction of its legal entity, at least until the State

has exercised such reserved power.    After the decision of the Dartmouth College case, a number of the States, by statute or constitutional provision, reserved the right to revoke franchises, so that grants thereafter made should be subject to such provision.    This was the case in Georgia.    Civil Code, §§ 5730, 5731, 1880.

But it is unnecessary in the present case for us to decide whether a purely private corporation has a right to surrender its charter and dissolve itself without acceptance on the part of the State. Whether it has or not, the judgment under review was erroneous. First let us deal with it on the theory that acceptance was necessary, and consider whether the superior court, in the exercise of its equitable jurisdiction, had authority to accept a surrender, and, on the basis thereof and of the petition presented, to pass the order now before us.

In many of the States the legislature has provided a method by which a voluntary dissolution of a corporation may be had, or by which it may be dissolved or its assets administered under certain circumstances.    Where there is such legislation, no difficulty arises as to the power of the court.    In this State no provision has been made by legislative enactment for a voluntary winding up of a corporation on its own petition to a court of equity.    When the original code was adopted, it contained a codification of the pre-existing law on the subject of the dissolution of corporations, which has been retained in later codes.    It was declared that "Every corporation is dissolved—1. By expiration of its charter.    2. By forfeiture of its charter.    3. By a surrender of its franchises.    4. By the death of all its members without provisions for a succession." Civil Code of 1895, § 1882.    Dissolution by forfeiture dates from the judgment of a court of competent jurisdiction, declaring the forfeiture.    § 1883.    On the subject of surrender it was stated: "A corporation may be dissolved by a voluntary surrender of its franchises to the State.    In such case such surrender does not relieve its officers or members from any liability for the debts of the corporation."    § 1884.    The question then arises, if a corporation desires to surrender its franchises, "to the State," who has authority on behalf of the State to accept the surrender (if necessary), and thus complete the dissolution?    Originally charters were granted by the General Assembly.    By the act of 1843, Cobb's Digest, p. 542, it was provided that a private corporation for any

purpose except banking or insurance might be "created" by comply-ing with certain provisions, including the filing of an application with the superior court and the passing of an order granting it. By the constitution of 1868 it was declared that the General As-sembly should have no power to grant corporate privileges to pri-vate companies, except certain ones which were named; "but it shall prescribe by law the manner in which such power shall be exercised by the courts." Code of 1873, § 5068. The constitution of 1877 contained a similar provision. In 1891 an act was passed proposing an amendment to the constitution, which was subse-quently ratified by the people. Acts of 1890-1891, p. 59. As thus amended the section reads as follows: "The General Assembly shall have no power to grant corporate powers and privileges to private companies, to make or change election precincts, nor to establish bridges or ferries, nor to change names of legitimate children; but it shall prescribe by law the manner in which such powers shall be exercised by the courts. All corporate powers and privileges to banking, insurance, railroad, canal, navigation, express, and tele-graph companies shall be issued and granted by the secretary of State in such manner as shall be prescribed by law; and if in any event the secretary of State should be disqualified to act in any case, then in that event the legislature shall provide by general laws by what person such charters shall be granted." Civil Code, § 5780. It was contended that the conferring on the superior court of the power to grant charters to private companies carried with it by implication the power to accept the surrender of such charters. It has been declared that the power conferred upon the courts to grant charters to corporations is legislative or quasi legislative, and not judicial, in its character; and that there is no provision of law authorizing any one to appear and object to the grant of cor-porate powers by the courts, and for a review by a writ of error of the action of the superior court in granting such charters. *Gas-Light Company of Augusta* v. *West*, 78 *Ga.* 318. The action of a judge in granting charters has sometimes been spoken of as ad-ministrative in character. No doubt, in part at least, in order to relieve the legislature of the burden and delay incident to granting charters to private corporations, entailing the introduction of a bill, its reading on three separate days in each house, its passage, and its approval by the Governor, the constitutional provision above

quoted was adopted. The legislature passed an act declaring that the superior courts should have power to create private corporations, and to hear petitions for charters and grant them, "if satisfied that the application is legitimately within the purview and intention of the code." Civil Code of 1895, § 2350. It must be observed that the constitution did not confer upon the superior court the entire legislative power of the State in regard to private corporations. The declaration is made in article 1, section 3, paragraph 2 (Civil Code, § 5730), that "No bill . . making irrevocable grants of special privileges or immunities shall be passed." And paragraph 3 declares that "No grant of special privileges or immunities shall be revoked, except in such manner as to work no injustice to the corporators or creditors of the incorporation." § 5731. It is evident from the use of the expression "no bill," etc., that an act of the legislature, or something done in accordance with an act of the legislature, was contemplated. In § 1880 it is declared that in all cases of private charters thereafter granted, "the State" reserved the right to withdraw the franchise, unless expressly negatived in the charter. It would not be claimed that the superior court could act for the State under this section, without more. The legislature has the general power of enacting laws for the State in regard to corporations; and in the absence of any provision for the acceptance of a voluntary surrender by the court, it does not take by implication the State's power in that regard. It by no means follows that the conferring on a governmental agency of the power to issue charters includes the power to release or accept a surrender of such grants. The delegation of authority to do a certain thing does not necessarily imply the delegation also of the power to accept its undoing.

The paragraph of the constitution above quoted (article 3, section 7, paragraph 18, Civil Code, § 5780), as amended, declares that all corporate powers and privileges to banking, insurance, railroad, canal, navigation, express, and telegraph companies shall be issued and granted by the secretary of State in such manner as shall be prescribed by law; and if the secretary of State should be disqualified to act in any case, then the legislature shall provide by general laws by what person such charters shall be granted. It would hardly be thought that the constitution intended, in regard to the enumerated corporations, to authorize the secretary of State, or, in case he

should be disqualified, some other person acting in his stead, to accept surrenders of charters of railroads, banks, etc.

But it is suggested that section 1886 of the Civil Code recognizes the power of acceptance of a surrender as being in the superior court. It reads as follows: "Upon the dissolution of a corporation, for any cause, all of the property and assets of every description belonging to the corporation shall constitute a fund—first, for the payment of its debts, and then for equal distribution among its members. To this end the superior court of the county where such corporation was located shall have power to appoint a receiver, under proper restrictions, properly to administer such assets under its direction." It does not on its face purport to confer on the courts the power to accept a surrender of franchises, but declares, that, "Upon the dissolution of a corporation for any cause," etc. On turning to the act of 1855, from which it was derived (Acts 1855-6, p. 226), it will be seen that its title was, "An act to preserve and dispose of the property and effects of corporations after their dissolution, and to provide for the payment of the debts due by the same." It declared that after its passage, if, "either by the expiration or forfeiture of its charter or in any other manner whatever, any corporation should be dissolved," its real estate should not revert to the grantor nor its personal estate escheat, nor should the debts due to and by such corporation at the time of its dissolution be extinguished, but its property should become a trust fund, first for the payment of its debts, and then for distribution among the stockholders. It also provided, that "it shall be the duty of the judge of the superior courts of the circuit in which such dissolved corporation may have been located, on a suitable and proper application of any creditor of (and on failure of any creditor to do so) by any stockholder in the same, to appoint a receiver." Thus, if there were any doubt about the meaning of section 1886 of the Civil Code, a reference to the act from which it was derived will plainly show that it was not intended to confer power to accept a surrender of franchises, but to preserve the assets and liabilities after dissolution, for the purpose of having them properly dealt with.

If the granting of a charter by the superior court is treated as in the nature of a legislature or quasi-legislative function, and not judicial in character, it would seem that an acceptance of a surrender of a charter is legislative in character, and should be exercised

by the legislature or under enactments made by it. The appointing of a receiver by a court, with authority to conduct business, buy and sell, and report to the court, and the granting of an injunction against creditors, preventing them from proceeding except by intervention, savors more of a judicial proceeding. It has been said, that, "In the absence of express legislative authority, a court of equity has no power to dissolve a corporation and appoint a receiver to administer its assets." *Gibson* v. *Thornton,* 107 *Ga.* 545, 562 (33 S. E. 895). Numerous authorities were cited by Mr. Justice Fish in connection with this statement. In so far as they may rest on any distinction between a court of law and a court of equity, they would not apply in Georgia, where legal and equitable powers are united in the superior court. But, as indicating that the superior court does not ordinarily dissolve corporations and appoint a receiver for their assets, as a part of its equitable powers, they are entitled to weight.

Aside from legislative provision, if a private corporation can dissolve itself by resolution of its stockholders, and thus terminate its existence without any acceptance of the surrender of its charter, it would apparently be dissolved upon the passage of such resolution. It can not well dissolve itself and be dead, but remain sufficiently alive to thereafter place itself in the hands of a receiver. If it were dissolved by virtue of the resolution, it would seem that it could not persist as a petitioner for equitable relief. If it were not dissolved by the resolution of its stockholders, but such resolution were merely a declaration of a future intent to dissolve, then we have an undissolved corporation having itself placed in the hands of a receiver on ex parte petition, and asking equitable relief preventing its creditors from interfering with it or its assets.

The facts of the present case differentiate it from those in which a court of competent jurisdiction appointed a receiver, and where it has been held that such appointment can not be collaterally attacked, even if erroneous. Moreover, as there were no parties defendant to the appointment of the receiver, creditors had no opportunity to be heard in opposition thereto, or to bring the case to this court for review. The receiver appointed by the court of bankruptcy petitioned the judge of the State court to direct the receiver so appointed to deliver the assets to him. This was not a mere disregarding of the appointment, but was a direct application.

to the court which made it.   In *McGahee* v. *Cruickshank,* 133 *Ga.* 649 (66 S. E. 776), where, upon the application of the stockholders of a corporation, one of whom was also a large creditor, the State court appointed a receiver, and thereafter the company was adjudged a bankrupt, and a receiver was appointed by the court of bankruptcy, it was. held not to be error for the judge of the State court to direct the assets to be delivered to the receiver of the court of bankruptcy, upon application therefor, although solvency was averred in the proceeding in the State court.   The Federal courts have held that an effort to dissolve a corporation would not destroy the right to adjudicate it a bankrupt, if proceedings were had in due time.   In re Adams & Hoyt Co., 164 Fed. 489; In re Watts, 190 U. S. 1 (23 Sup. Ct. 718, 47 L. ed. 933) ; in re Storck Lumber Co., 114 Fed. 360; In re Moench & Sons Co., 123 Fed. 965, 130 Fed. 685 (66 C. C. A. 37).

The jurisdiction of the court of bankruptcy was denied by the defendant in error.   The bankruptcy act of 1898 (30 Stat. 546, U. S. Comp. St. 1901, p. 3422), in enumerating acts of bankruptcy, stated as one of them that if the debtor had "made a general assignment for the benefit of his creditors."   Section 3, subsection a (4).   In 1903 an amendment was made to this provision by adding the following words :   "or, being insolvent, applied for a receiver or trustee for his property or because of insolvency a receiver or trustee has been put in charge of his property under the laws of a State, of a territory, or of the United States."   32 Stat. 797 (U. S. Comp. Stat. Supp. 1909, p. 1309).   This dealt with two things, either of which. would constitute an act of bankruptcy. One was if the debtor, "being insolvent, applied for a receiver or trustee for his property ;" the other was if a receiver or trustee has been put in charge of his property *because of insolvency.*   In re Spalding, 139. Fed. 244 (71 C. C. A. 370).   In the former it was sufficient if while insolvent the debtor applied for a receiver or trustee for his property.   There can be no question that in the present case the debtor applied for and obtained a receiver for its own property.

But it was contended that the State court should not direct its receiver to deliver the assets to the receiver appointed by the court of bankruptcy until after the company had been adjudicated a bankrupt, as it denied insolvency and demanded a jury trial.   Under subsection 3 of section 2 of the bankruptcy act of 1898, courts of bank-

ruptcy were given jurisdiction to "appoint receivers or the marshals, upon the application of parties in interest, in case the courts shall find it absolutely necessary, for the preservation of assets, to take charge of the property of bankrupts after the filing of the petition and until it is dismissed or the trustee is qualified." Reliance was placed on the decision in the United States Circuit Court of Appeals for the Second Circuit in the matter of Oakland Lumber Company, 23 Am. B. R. 181 (174 Fed. 634), in which the court dealt with the care which should be exercised in the appointment of a receiver in bankruptcy, and criticised the practice of appointing receivers as a matter of course, or on insufficient grounds, upon the filing of a petition in bankruptcy. In the opinion Coxe, Circuit Judge, said: "The power to take from a man his property, without giving him an opportunity to be heard, is both arbitrary and drastic, and should not be exercised except in the clearest cases. Congress recognized the necessity for caution by limiting the appointment of receivers to cases where it is 'absolutely necessary' for the preservation of the estate. . . It can not be presumed that an assignee under a State law intends to plunder the fund he is appointed to administer. Unless something be shown to the contrary, the presumption is persuasive that during the interval between the filing of the petition and the appointment of a trustee, the property will be entirely safe in the hands of the assignee, especially if he be enjoined from disposing of it pendente lite. We are informed that it has grown into a well-established custom for the attorney for the petitioning creditors, when he files his petition, to apply at the same time for the appointment of a receiver, and that the application is usually granted. If such a practice exists, we see nothing in the law to warrant it." What was said in that case was by a reviewing court in reference to the district court, which was subject to its review.

In the case at bar the United States district court, as a court of bankruptcy, had jurisdiction to appoint a receiver. If the defendant thought that he erred in so doing, or that the appointment was improvidently made, it or the receiver of the State court should have taken steps in the proper jurisdiction to have such order vacated. This court has no power to review the correctness of the decision of the court of bankruptcy; nor can such action of that court, within the limits of its jurisdiction, be collaterally attacked. If the

·court of bankruptcy, under the constitution of the United States and the laws passed in pursuance thereof, is entitled to possession through its receiver, the State court can not decline to surrender ·such possession because it is of the opinion that the transfer before adjudication might be disastrous to the estate. If the custody of the State court is one which under the law does not yield to bankruptcy, the case is different. Nothing that was said in *Boston Mercantile Co.* v. *Ould-Carter Co.,* 123 *Ga.* 458 (51 S. E. 466), militates against what is here decided. Nor is this a case where the possession of a receiver appointed by a State court will not be affected by a subsequent adjudication in bankruptcy, like that of Carling *v.* Seymour Lumber Co., 113 Fed. 483 (5 C. C. A. 1). See also *Merry* v. *Jones,* 119 *Ga.* 643 (46 S. E. 861).

It was contended that the court of bankruptcy appointed a re·ceiver without requiring him to give bond in accordance with the provisions of the bankruptcy act. We think this would be too rigid a construction to be placed upon the order. It was recited, that, upon hearing argument and consideration, it was ordered and adjudged "and upon petitioners giving bond in the sum of $5,000, conformably to the acts of Congress relative to bankruptcy," etc. We understand this requirement of a bond to be a condition affecting the entire order, and not merely the provision immediately following. It was contended that the bond which was given and approved by the judge of the court of bankruptcy before the receiver appointed by him applied to the State court for possession of the assets did not have two resident sureties, as required by section 3c of the bankruptcy act of 1898. Under the general law authorizing the acceptance of surety companies on bonds, this would not seem to be erroneous. 28 Stat. 279 (U. S. Comp. St. 1901, p. 2315). Matter of Sears, Humbert & Co., 10 Am. B. R. 389, 393 (128 Fed. 275, 62 C. C. A. 623). If this constituted any irregularity, an application should have been made to the bankruptcy court. Matter of Haff, 13 Am. B. R. 354 (135 Fed. 742, 68 C. C. A. 380). It did not authorize the treating of the order of the court of bankruptcy as void. It was also alleged that the petitioning creditors sought to dismiss the petition in bankruptcy; but there was no evidence on this subject which would authorize us to hold that the court of bankruptcy lost jurisdiction.

. We feel sure that our learned brother of the superior court acted

from a sincere conviction of duty in respect to the ·estate in the hands of the receiver who had been appointed by him; but under our view of the law we feel constrained to differ with him as to the authority to withhold the custody of the property from the receiver appointed by the court of bankruptcy.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*